# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**CECELIA R. VARNEY o/b/o J.J.V.,**
**Next of Kin of Stephen Rufus Varney,**

      **Plaintiff,**

**vs.**                               **CIVIL ACTION NO. 2:17-CV-03012**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

      This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's[1] applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered May 25, 2017 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 9 and 10.)

---

[1] Plaintiff, Cecelia R. Varney, is the surviving divorced spouse of Claimant Stephen Rufus Varney, the decedent, and she is the mother in care of J.J.V., a minor and biological child of Claimant and Plaintiff. Claimant died on March 24, 2016. (Tr. at 20.) Plaintiff is the substituted party due to the death of Claimant and prosecutes this appeal. (Tr. at 16.) Hereinafter, the decedent will be referred to as "Claimant" and Plaintiff will continue to be referred to as "Plaintiff".

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 9.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 10.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Claimant protectively filed his applications for Titles II and XVI benefits on May 22, 2012, alleging disability since May 19, 2012, because of "residuals of back surgery, left arm injury, left ankle injury, and depression." (Tr. at 351.) His claims were initially denied on October 31, 2012 (Tr. at 143-152, 153-162.) and again upon reconsideration on February 20, 2013. (Tr. at 164-169, 170-175.) Thereafter, Claimant filed a written request for hearing on April 15, 2013. (Tr. at 176-177.)

An administrative hearing on March 25, 2015 was continued in order for Claimant to obtain representation. (Tr. at 90-96.) A second hearing was held on January 29, 2016 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 42-89.) On April 7, 2016, the ALJ entered an unfavorable decision. (Tr. at 21-41.) On June 10, 2016, Plaintiff sought review by the Appeals Council of the ALJ's decision. (Tr. at 14-20, 418-421.) The ALJ's decision became the final decision of the Commissioner on March 20, 2017 when the Appeals Council denied Plaintiff's Request. (Tr. at 1-6.)

On May 23, 2017, Plaintiff timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 6 and 7.)

Subsequently, Plaintiff filed a Brief in Support of Judgment on the Pleadings (Document No. 9.); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 10.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 33 years old as of the alleged onset date, and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 33, 46.) Claimant has a high school education and did not attend special education classes. (Tr. at 50, 352.) He last worked in May 2012 as a continuous miner operator and had worked "on and off 15 years" in the mines. (Tr. at 50, 343.) On May 19, 2012, Claimant had a car accident and sustained a broken left leg and ankle, and had not worked since then. (Tr. at 47, 351.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1

to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## **Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2015. (Tr. at 26, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of May 19, 2012. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: residuals of a back injury; residuals from fracture of the left forearm; residuals from a left ankle crush injury; depression/bipolar disorder/adjustment disorder; anxiety/posttraumatic stress disorder; pain disorder; and panic disorder. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded

Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 27, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC")

> to lift and carry 40 pounds occasionally and 25 pounds frequently, sit six hours in an eight-hour workday, and stand and walk two hours in an eight-hour workday. The claimant can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch or crawl. He can tolerate occasional exposure to extreme temperatures, humidity, wetness, vibrations, and hazards. He can frequently, but not continuously use of upper extremities in handling, fingering, and feeling. He retains the capacity to understand, remember, and carry out simple routine repetitive tasks. He can respond appropriately to occasional superficial interaction with coworkers and supervisors, where there is no teamwork or over-the-shoulder supervision. He should have no interaction with the general public. The claimant should perform no work activity with fast-paced production and should make no more than simple work related decisions.

(Tr. at 28-29, Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform his past relevant work. (Tr. at 33, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from May 19, 2012 through the date of the decision. (Tr. at 34, Finding No. 11.)

**Plaintiff's Challenges to the Commissioner's Decision**

Plaintiff first argues that the ALJ's decision is not supported by substantial evidence because she failed to properly consider Claimant's severe mental impairments under SSR 96-9p, which would have at least limited him to sedentary work. (Document No. 9 at 5-6.) The ALJ found Claimant's mental impairments moderate, however, the record shows that he died of a drug

overdose, which Plaintiff contends indicate they were more severe and likely met the Listings 12.04, 12.06, and/or 12.09. (Id. at 6.) Plaintiff points out that the psychological opinions from Paula Bickham, Ph.D. and Lester Sargent, M.A. both found Claimant had severe social functioning limitations, which were supported by Claimant's testimony, his friend's testimony, as well as the medical evidence that Claimant had ongoing suicidal ideation, which came to fruition. (Id. at 6-7.)

Lastly, Plaintiff argues that the ALJ erred by disregarding the vocational expert's testimony that Claimant would be unable to maintain substantial gainful activity if he exceeded certain work place tolerances. (Id. at 7.)

Plaintiff asks that benefits be awarded as provided by law, or alternatively, to remand for rehearing and be granted her costs expended in prosecuting this appeal. (Id. at 7-8.)

In response, the Commissioner argues that this jurisdiction recently explained that an ALJ "complies with SSR 96-9p when she analyzes a claimant's functional deficits, constructs and RFC assessment that accounts for those limitations, and engages a vocational expert to assess whether the claimant could perform sedentary work despite those limitations."[3] (Document No. 10 at 11.) The Commissioner asserts that the ALJ complied with the letter and intent of SSR 96-9p, as is evident by her evaluation of the medical evidence, particularly with respect to Claimant's treating physician's opinion, and determined Claimant had less than a substantial loss in his ability to perform basic work activities; after consultation with the vocational expert, the ALJ determined Claimant could still work. (Id. at 12-14.)

Next, the Commissioner points out that Claimant's overdose, though unfortunate, was not the result of a suicide, because the death certificate explicitly states that he abused cocaine and

---

[3] Holder v. Berryhill, No. 3:16-cv-08760, 2017 WL 4080700, at *20 (S.D.W. Va. Aug. 21, 2017) (Report and Recommendation) (M.J. Eifert).

non-prescribed drugs and the death was listed as accidental. (<u>Id</u>. at 14.) In short, Plaintiff does not provide any evidence to suggest that Claimant met any of the Listings for his mental impairments, and that the record does not support that he was addicted to drugs. (<u>Id</u>. at 14-15.)

Further, the ALJ found Claimant only had mild impairments in his activities of daily living and in his concentration, persistence or pace, which is corroborated by the evidence of record. (<u>Id</u>. at 15-16.) Despite Dr. Bickham's and Mr. Sargent's finding Claimant was more restricted in social functioning, the ALJ determined Claimant was not so limited since he was in contact with family, a good relationship with his ex-wife, and reported no difficulties while incarcerated. (<u>Id</u>. at 16-17.)

The Commissioner points out that even if Claimant had marked limitations in social functioning, the evidence does not support a finding that he met Listing criteria, because the evidence did not show that he also had marked restrictions in the other functional areas and episodes of decompensation, all considered under B criteria for 12.04 and 12.06. (<u>Id</u>. at 16-17.) The Commissioner adds that Claimant would not have met the criteria for 12.09, because the evidence of record did not indicate that he was addicted to drugs or alcohol. (<u>Id</u>. at 15, fn.3.)

Finally, the Commissioner argues that the ALJ posed hypothetical questions to the vocational expert that incorporated the limitations established in the record, rendering a consistent RFC assessment that is supported by substantial evidence. (<u>Id</u>. at 17-18.)

The Commissioner concludes that the final decision is supported by the substantial evidence and asks the Court to affirm the decision. (<u>Id</u>. at 18.)

**<u>The Relevant Evidence of Record</u>**[4]

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Medical Records Related to Physical Impairments:</u>

Claimant had back surgery in 2007. (Tr. at 488.) April 2012 x-rays were normal. (Tr. at 486-488.) In May 2012, Claimant was in a car accident and injured his left ankle. (Tr. at 463-465.) His ankle was placed in a splint, and he was advised to use crutches and elevate his ankle above his heart. (Tr. at 465.) Claimant removed the splint himself and did not seek follow-up care. (Tr. at 497.)

During a January 2013 consultative examination with David Winkle, M.D., Claimant complained of pain related to left arm, left ankle, and back injuries. (<u>Id</u>.) Dr. Winkle observed left ankle and left forearm tenderness, but no atrophy. (Tr. at 498.) He had back tenderness as well, but straight leg raising testing was negative. (Tr. at 499.) Dr. Winkle observed normal grip strength, dexterity, and fine manipulation without tenderness. (<u>Id</u>.) Claimant could heel walk bilaterally, could not toe walk on the left side, and could toe walk on the right side. (<u>Id</u>.) He could also perform tandem walk and squat, and his reflexes were normal. (<u>Id</u>.)

Dr. Winkle opined that Claimant could lift 40 pounds occasionally, 25 pounds frequently, and could stand or walk for two hours in an eight-hour workday. (<u>Id</u>.)

State agency medical consultant Rabah Boukhemis, M.D. reviewed the record on February 6, 2013, and opined that Claimant could perform medium exertional work with various postural and environmental limitations. (Tr. at 121-123.)

Claimant had limited records over the next two and half years due to his incarceration. (Tr. at 510.) On August 24, 2015, Claimant established care with a new provider, who observed that

he was "fairly healthy." (Id.) On examination, Claimant appeared well, his musculoskeletal strength was normal, as was his balance and gait. (Tr. at 511.)

Medical Records Related to Mental Impairments:

Claimant was prescribed Prozac in April 2012. (Tr. at 484-485.) There is little record of his mental health treatment until after he was released from prison in July 2015. (Tr. at 513.)

During a September 2015 intake interview at Prestera Center, Claimant explained that his childhood flashbacks and the death of his mother and sister were a source of strain. (Id.) He also reported that being in prison had made him "high strung." (Id.) Claimant reported social isolation and that he prayed to die. (Id.) He reported no alcohol consumption since going to prison in May 2013. (Tr. at 514.) He denied recent use of illegal drugs. (Tr. at 514-515.) In her summary of treatment, Cheri L. Grimm, A.D.C, M.A., reported that Claimant "would like to receive medication and social security disability." (Tr. at 515.) Ms. Grimm recommended therapy, which Claimant declined. (Id.) Ms. Grimm referred Claimant for a psychiatric evaluation. (Id.)

Jordan Adkins, A.R.P.N., conducted the psychiatric evaluation later that month. (Tr. at 520-525.) Claimant reported: "I just got out of prison and I have a hard time dealing with this." (Tr. at 520.) He reported depression, anxiety, nightmares, flashbacks, and panic attacks. (Id.) He had not consumed alcohol in over three years and denied drug use. (Id.) Ms. Adkins observed that Claimant was guarded and agitated; however, his remote and immediate memory, and concentration were intact. (Tr. at 521-522.) His insight and judgment were fair. (Tr. at 522.) Ms. Adkins prescribed Trileptal and Vistaril. (Tr. at 523-524.) She reported that Claimant "was angry that I would not give him Xanax as I told him that was not the route to go for his problems." (Tr. at 524.) Ms. Adkins encouraged Claimant to return in four to six weeks; her prognosis was

guarded. (Id.)

<u>Treating Physician Records:</u>

On November 3, 2015, Claimant began treating with Krista Rhodes, M.D. at Prestera Center. (Tr. at 526-531.) Dr. Rhodes noted that Claimant requested to be changed from a nurse practitioner to a psychiatrist, "I guess she isn't learning enough", and that Claimant "need[s] nerve medication." (Tr. at 526.) Claimant reported suicidal and homicidal ideations, but committed to safety. (Id.) Claimant reported that Trileptal does not help and "begs" for Xanax or Klonopin during his interview, and denied overuse of medications. (Id.) Dr. Rhodes noted that Claimant "worries that if he is not prescribed Xanax that he will get too angry and 'kill someone.' He also says 'if I go out and shoot myself would you feel bad about not giving me what I need?' He is uninterested in therapy." (Id.)

On examination, Dr. Rhodes observed that Claimant was casual in appearance, his mood was poor, and his affect dysphoric. (Tr. at 527.) His attention and concentration were fair, his speech was normal, his memory and thought processes were intact, and he had no abnormal thoughts. (Id.) Dr. Rhodes observed Claimant's judgment was mildly impaired; he had partial insight; and he had no suicidal, self-injurious, or homicidal ideations. (Tr. at 528.) She prescribed Depakote and Clonidine. (Tr. at 529.) Claimant resisted therapy and asked for a referral to another physician. (Id.)

On January 19, 2016, Dr. Rhodes completed a medical source statement. (Tr. at 534-537.) She reported three months of contact with Claimant, and that she changed his prescriptions on the day that she completed the statement. (Tr. at 534.) Dr. Rhodes reported that Claimant witnessed severe trauma, which led to feelings of worthlessness and hopelessness. (Id.) She also commented

that Claimant was "unwilling to work on these issues in a therapeutically productive manner." (Id.) Dr. Rhodes opined that his prognosis was poor "if [he] is unwilling to work through" his issues (Id.)

Dr. Rhodes opined that Claimant had no limitations in his ability to understand and remember simple instructions, carry out simple instructions, and to make judgments on simple work related decisions. (Tr. at 535.) She found moderate limitations in the ability to interact with the public, supervisors, and co-workers. (Id.) She also concluded that Claimant had only mild limitations in his ability to understand, remember, and carry out complex instructions, to respond appropriately to usual work situations, and to adapt to changes in a routine work setting. (Id.) Dr. Rhodes reported that Claimant smoked marijuana and was not willing to quit, which kept her from prescribing controlled substances. (Tr. at 537.) She concluded that she did "not feel [Claimant's] symptoms will change until he is willing to pursue additional types of treatment." (Id.)

State Agency Consultative Examiner:

At the initial level in assessing his disability determination in October 2012, the record indicates that Claimant failed to cooperate with the attending psychological consultative examiner provided by the Agency. (Tr. at 100-101, 107-108.)

During a January 2013 mental health status examination with Lester Sargent, M.A., Claimant reported a difficult upbringing, but a good relationship with his ex-wife, who drove him to the examination. (Tr. at 503-504.) His chronic pain was "a prominent focus" during the examination. (Tr. at 504.) Claimant reported long-term depression, panic attacks, and a suicide attempt in 2007. (Id.) He was hospitalized in 2004 for mental health issues and again at another unspecified date. (Tr. at 504-505.) Claimant reported suicidal and homicidal ideations, but denied

plan to harm himself or others. (Tr. at 505, 507.) He reported a history of alcohol use, two DUIs, and a history of polysubstance abuse; however, "he has not used any type of illegal substance for at least two years." (Tr. at 505, 506.) His family doctor prescribed anxiety and pain medication. (Tr. at 505.)

On examination, Claimant was adequately groomed, cooperative, and his speech was coherent. (Tr. at 506.) He maintained poor eye contact but was fully oriented. (<u>Id</u>.) He was depressed, had a restricted affect, and his thought processes were understandable and connected. (<u>Id</u>.) Mr. Sargent found no evidence of delusional thinking or perceptual disturbances. (<u>Id</u>.)

Claimant's judgment was mildly deficient and his insight was fair. (Tr. at 506-507.) His memory, concentration, persistence, and pace were all mildly deficient, and his social functioning was severely deficient. (Tr. at 507.) Mr. Sargent assessed Claimant with recurrent and severe major depressive disorder, panic disorder, and pain disorder with psychological factors and a general medical condition. (<u>Id</u>.) Claimant's prognosis was poor. (Tr. at 508.)

<u>State Agency Psychological Consultant:</u>

In February 2013, Paula Bickham, Ph.D. reviewed Claimant's records and opined that he had mild restrictions in his activities of daily living, marked difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 117-120, 123-124.) She opined that Claimant had no episodes of decompensation. (Tr. at 120.) Dr. Bickham opined that Claimant had no understanding or memory limitations, and concluded that he had no sustained concentration limitations or marked social limitations. (Tr. at 123.) She opined that Claimant would have no problems with seeking assistance, but had marked limitations interacting with the general public, and moderate limitations with respect to supervisors and co-

workers. (Id.) Dr. Bickham concluded that Claimant had no significant adaptive limitations except for moderate limitations in adapting to changes in the work setting. (Tr. at 124.) In explaining her findings, Dr. Bickham reported that Claimant could "learn and perform work-like activities in an environment with no contact [with] the general public and limited contact with others in the work environment." (Id.)

**The Administrative Hearing**

Claimant Testimony:[5]

Claimant testified that his memory is not good, and that "he can't hardly think straight." (Tr. at 48, 62.) He stated that he had a difficult childhood, having been physically abused, and that he saw the bodies of his sister and brother in law, victims of a murder-suicide. (Tr. at 51.) Claimant also lost his mother in February 2013 (Tr. at 52.) He testified that he has bad days and good days with his pain, and on a bad day, he stated "I want to cry and die." (Tr. at 60.) He admitted he had about 22 bad days a month; he would not get out of bed, only to go to the bathroom. (Tr. at 60-61.)

Claimant testified that his depression is so bad that he does not want to eat and that he had been treated for depression "a lot over my lifetime." (Tr. at 61.) He had been an inpatient for mental issues twice, once when he put a gun to his head and shot himself, leaving a "big black mark" on the side of his head. (Id.) At the time, he was grieving over his murdered sister, and that he still mourns this loss. (Id.) Claimant testified that he stays so depressed that he sometimes misses showers and baths because he "just really don't care." (Tr. at 70.)

---

[5] Because Plaintiff's appeal concerns the ALJ's treatment of his mental impairments, the undersigned focused on Claimant's testimony regarding his mental impairments.

Claimant "can't be around people", he "can't go to the supermarket" or Wal-Mart, and has trouble concentrating and staying focused. (Tr. at 62, 63.) He testified that he deals with stress by "just want[ing] to die" and that he had panic attacks in the middle of the night that would wake him up; it would feel as if he could not breathe and it was the "end of the world." (Id.) Claimant stated these attacks happen pretty often, all of a sudden, and would sometimes last for days. (Tr. at 63.) He also admitted to having crying spells pretty often. (Id.) Claimant testified that being around a group of people can feel like he is going into a panic attack. (Id.) He also has trouble with authority figures, coworkers, and being in public. (Tr. at 63-64.) He does not leave the house. (Tr. at 64.) Claimant admitted that he had been in jail for a DUI and was most recently incarcerated for about two years because he "run a state trooper over with a four-wheeler and I got a DUI and obstruction." (Id.) Claimant quit drinking after this incident. (Tr. at 64-65.)

Claimant admitted to smoking marijuana because of his panic attacks and pain; he has smoked marijuana about four or five times since he was released from jail in July 2015. (Tr. at 65.) Claimant stated that he had gone to several doctors, but none of them would help him. (Tr. at 65-66.) Claimant acknowledged Dr. Rhodes suggested that he attend therapy, but he stated "[i]t ain't going to help. It don't help. I could talk to my friends and family at the house and it's – it ain't never going to change. It's – they're dead, they're gone. There ain't nothing that's going to bring them back, you know?" (Tr. at 66.)

Claimant testified that his friend Sharon Spence was the only person who would take him in after he got out of prison; he grew up with her son. (Tr. at 66-67.) "She does everything for me." (Tr. at 67.) Claimant has lived with Ms. Spence ever since he got out of prison, and his daughter

and ex-wife also live with them. (Id.) Claimant testified that his daughter was 11 and that she was the only thing that keeps him from committing suicide. (Id.)

To occupy his time, Claimant testified that he watches TV to keep his mind focused on something besides his pain and memories. (Tr. at 71.) He stated that he gets on Facebook every once in a while. (Id.) He does not get out much, he has no friends, he does not go to church and does not believe he could work eight hours a day, five days a week because of his pain and depression. (Tr. at 71-72.)

Sharon Spence Testimony:

Ms. Spence testified that she has known Claimant all his life, as well as his family members. (Tr. at 75.) Ms. Spence confirmed that Claimant had contacted her after her got out of jail in July 2015 and that he was homeless and had no money or clothes and that all of his family were deceased, so she took him in. (Tr. at 76.) Ms. Spence's son also lives with her, and his daughter, who she adopted, Claimant's daughter and ex-wife. (Id.)

Ms. Spence testified that Claimant "has no ability to be in the presence of other people." (Id.) He stays in his room except to come out and eat, usually once a day. (Id.) She stated that when around other people, Claimant has panic attacks; he will stay in his room and not come out when she has other family members come visit. (Tr. at 77.) She described his panic attacks where he looked frightened and could not talk, and pace a little bit; this happened on a regular basis. (Id.)

In addition to being in physical pain, Ms. Spence testified that Claimant is in a lot of mental pain and that he cannot do any activities for the household. (Tr. at 78.)

Ms. Spence testified that she takes Claimant to his medical appointments. (Id.) She confirmed that Claimant has not had alcohol since leaving prison, and from "time to time" he had been given a joint from the family next door. (Tr. at 79.)

Ms. Spence opined that Claimant's mental condition is really sad, and that he feels like he cannot overcome the tragedy of the deaths he has been through, especially his sister's murder. (Tr. at 80.)

William Tanzey, Vocational Expert ("VE") Testimony:

The first hypothetical question the VE considered included the following: an individual with Claimant's age, education, work history, limited to lifting 40 pounds occasionally and 25 pounds frequently, could walk and stand two hours in an eight-hour workday, could sit at least six hours in an eight-hour workday, could occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, could occasionally balance, stoop, kneel, crouch, and crawl, could tolerate occasional exposure to extreme temperatures, humidity, wetness, vibrations and hazards. (Tr. at 82.) With regard to the mental component of the first hypothetical, the ALJ provided the following limitations:

> This individual retains the capacity to understand, remember, and carry out simple – I'm going to say simple, routine, repetitive tasks, yes; can respond appropriately to occasional superficial interactions with coworkers and supervisors meaning no team work, no over-the-shoulder supervision, and should have no interaction with the general public; the individual should not be engaged in any work activity with fast-paced production requirements and should make no more than simple work-related decisions.

(Tr. at 82-83.) The VE testified that the first hypothetical would be at the sedentary physical demand level. (Tr. at 84.) The VE stated under this first hypothetical, the individual could perform the following jobs: simple grader/sorter; hand packer; and product inspector. (Id.)

When asked if the hypothetical individual had additional restrictions, including frequent use of the upper extremities, meaning handling, fingering, and feeling, the VE responded that the jobs then available would include security monitor, router, and table work. (Tr. at 84-85.) When the ALJ asked if this same restriction was reduced to occasional, the VE testified that all jobs would be precluded. (Tr. at 85-86.)

The ALJ asked whether the same hypothetical individual could stand one hour at a time, sit 30 minutes at a time, and could walk a block, the VE answered that the individual could not put in an eight hour shift, thus precluding all work activity. (Tr. at 86, 87.) When asked if the hypothetical individual could have no interaction with coworkers and supervisors, the VE responded that such an individual would be precluded from all work activity. (Tr. at 86.) When asked if the individual were off task 15 to 20 percent of the time due to pain or symptoms related to mental health, the VE testified that it would be beyond the tolerances of any employer, and the individual could not retain a job. (Tr. at 87.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As stated *supra*, Plaintiff contends that the ALJ failed to abide by Social Security Ruling 96-9p specifically concerning Claimant's mental limitations or restrictions, which substantially erode the unskilled occupational base, thus justifying a finding of disability. See, <u>Titles II & XVI: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work</u>, SSR 96-9P (S.S.A. July 2, 1996), 1996 WL 374185, at *9. With regard to Claimant's mental issues, Plaintiff specifically calls the Court's attention to Claimant's marked restrictions in social functioning as found by Dr. Bickham and Mr. Lester, coupled with his eventual overdose death, suggesting it was suicide due to his history of reported suicidal ideation.

The Implication of SSR 96-9p and Mental Limitations:

Pertinent to the issue in this case, SSR 96-9p provides:

**Mental limitations or restrictions:** A substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), will substantially erode the unskilled sedentary occupational base and would justify a finding of disability. These mental activities are generally required by competitive, remunerative, unskilled work:

* Understanding, remembering, and carrying out simple instructions.

* Making judgments that are commensurate with the functions of unskilled work--i.e., simple work-related decisions.

* Responding appropriately to supervision, co-workers and usual work situations.

* Dealing with changes in a routine work setting.

A less than substantial loss of ability to perform any of the above basic work activities may or may not significantly erode the unskilled sedentary occupational base. The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience. When an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.

Id. (**bold** in original)

The ALJ noted that Claimant had diagnoses of alcohol dependence and polysubstance abuse, and that the record provided that they were "sustained full remission (Exhibit 7F)."[6] (Tr. at 27, 503-509.) Indeed, the ALJ acknowledged that Claimant testified that he had no alcohol since his release from prison, and that he only smoked marijuana occasionally. (Tr. at 27.) The ALJ explicitly found "[t]here is no evidence the claimant experiences more than minimal limitations due to alcohol and polysubstance and therefore they [are] not severe impairments." (Id.)

The ALJ expressly found that Claimant's mental impairments did not meet or medically equal the criteria of Listings 12.04, 12.06, and 12.07. (Id.) The ALJ noted that Dr. Bickham completed a psychiatric review technique form, wherein she evaluated Claimant under 12.04, 12.06, 12.07, and 12.09, and found Claimant's only "marked difficulties" were in social functioning, and the other functional areas mild, and no episodes of decompensation. (Tr. at 27-28.) Notably, the ALJ gave this opinion "little weight" because evidence received at the hearing

---

[6] The undersigned notes that the ALJ cited the Exhibit concerning the consultative examination provided by Mr. Lester.

supported a finding that Claimant had "[n]o more than moderate mental impairment." (Tr. at 28.) Accordingly, the ALJ determined that in social functioning, Claimant had "moderate difficulties", because he "reported talking to family members (Exhibit 5E and 7F). The claimant did not report any difficulty with social functioning while incarcerated." (Tr. at 28, 365-372, 503-509.)

The ALJ noted Claimant went to Family Healthcare Associates in May 2012 and that he received a prescription for Prozac, but the record has no evidence of follow up treatment "until the State agency referred him for a consultative examination." (Tr. at 31.) The ALJ then noted that Claimant presented for Mr. Lester's examination in January 2013, who reported that Claimant's social functioning "was severely impaired", but had mild limitations in recent memory, concentration, persistence, and remote memory with no impairment in immediate memory." (Id.) The ALJ next reviewed the records from Prestera dated September 2015 through November 2015 that demonstrated Claimant's mental evaluations were unremarkable, save for his agitation that his providers would not give him Xanax. (Id.)

With regard to Dr. Rhodes's medical opinion, the ALJ noted Claimant's unwillingness to work on his mental issues "in a therapeutically productive manner" and the treating physician's opinion that Claimant's symptoms "would not change until he was willing to pursue additional types of treatment (Exhibit 10F)." (Tr. at 32, 534-537.) The ALJ noted Dr. Rhodes also opined that Claimant "had moderate limitations in the ability to interact with the public, supervisors, and co-workers"; "mild limitation in the ability to understand, remember, and carry out complex instructions and respond appropriately to usual work situations and to change in a routine work setting"; and "no limitations" in his ability to understand, remember and carry out simple instructions and to make judgments on simple work related decisions. (Id.) Recognizing that Dr.

Rhodes "indicated that the claimant is capable of performing unskilled work" and that it was consistent with the objective findings, the ALJ gave "significant weight" to her medical opinion. (Tr. at 32.)

The ALJ also gave "partial weight" to Dr. Bickham's opinion that Claimant retained the "capacity to learn and perform work-like activities in an environment with no contact of the general public and limited contact with others" because evidence obtained at the hearing level indicated he had greater limitations as identified in his RFC. (Tr. at 33.)

As an initial matter, it is clear that the ALJ's findings and conclusion that Claimant had moderate difficulties in social functioning is well supported by the substantial evidence of record. Moreover, substantial evidence demonstrated that Claimant was capable of unskilled sedentary work, especially in light of the opinion evidence provided by his treating psychiatrist, his mental impairments notwithstanding.

Further, the resulting RFC assessment concerning Claimant's impairments included the required narrative discussion that allows for meaningful judicial review and with respect to the findings of fact and conclusions provided in the written decision, it is also clear that the ALJ complied with the mandate to "build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). Given the ALJ's thorough analysis of all the evidence of record, particularly with regard to Claimant's mental impairments, as articulated in her questions to the vocational expert, it is obvious that she complied with SSR 96-9p. Interestingly, no mental health expert of record (or any other medical opinion of record) opined that Claimant was disabled because of his diagnoses.

Accordingly, the undersigned **FINDS** Plaintiff's argument that the ALJ failed to comply with SSR 96-9p lacks merit. In addition, there is simply no evidence that Claimant's mental impairments met or medically equaled any of the Listings, accordingly, the undersigned **FINDS** Plaintiff's argument on this point lacks merit, and the ALJ's determination that Listings 12.04, 12.06 and 12.07 were unmet in this case is based upon substantial evidence. Likewise, the evidence of record did not support any finding that Claimant met Listing 12.09, especially in light of his consistent denial of alcohol and polysubstance abuse, and limited use of marijuana, his overdose notwithstanding. Therefore, the undersigned **FINDS** Plaintiff's argument to that extent also lacks merit.

Vocational Expert Testimony:

Finally, with regard to Plaintiff's argument that the ALJ disregarded the vocational expert's testimony that Claimant was incapable of substantial gainful activity, the undersigned notes that Plaintiff provides no evidence from the record that would have supported the ALJ's hypothetical questions to that end. Hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated *supra*, there was no evidence in the record that showed Claimant had any greater limitations that those found by the ALJ in her RFC assessment, and further, there was no opinion evidence that suggested Claimant was disabled due to his physical or mental impairments. The ALJ posed numerous hypothetical questions to the vocational expert, in compliance with SSR 96-9p, and as a result, the RFC assessment was supported by the substantial evidence.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence, and further **FINDS** that the decision finding Claimant was not disabled is supported by

substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for Judgment on the Pleadings (Document No. 9.), **GRANT** the Defendant's request to affirm the final decision (Document No. 10.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 13, 2017.

Omar J. Aboulhosn
United States Magistrate Judge